**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **MELISSA L. OMERNIK,** | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:05-CV-436-Y** |
| | § | |
| **JO ANNE B. BARNHART,** | § | |
| **COMMISSIONER OF SOCIAL SECURITY,** | § | |
| **DEFENDANT.** | § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**
**AND**
**NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.   STATEMENT OF THE CASE

Plaintiff Melissa Omernik brings this action pursuant to Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of Social Security denying her claim for disability benefits under Title II and supplemental security income or SSI benefits under Title XVI of the Social Security Act. Omernik applied for disability insurance and SSI benefits on April 18, 2003 (with a protective filing date of March 28, 2003), alleging she became disabled January 1, 2000 due to a bipolar disorder. (Tr. 55, 304). Omernik maintained her insured status through 2003. (Tr. 58, 73).

The Social Security Administration denied Omernik's application for benefits both initially and on reconsideration. Omernik requested a hearing before an administrative law judge (the "ALJ"), and ALJ James A. Wendland held a hearing on September 16, 2004 in Fort Worth, Texas. (Tr. 321). Omernik was represented by counsel. On September 23, 2004, the ALJ issued an unfavorable disability decision after finding Omernik was capable of a modified range of medium work when she was compliant with her treatment regimen and refrained from using drugs or alcohol. (Tr. 23). The Appeals Council denied Omernik's request for review of her case, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 4). Omernik seeks judicial review of the decision and requests that this case be reversed because the Commissioner's determination is in error and not supported by substantial evidence.

B.     STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is severe if it has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work. 20 C.F.R.

§§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). At the third step, disability will be found if claimant's impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. *Id.* §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). A finding at any point in the five-step process that a claimant is disabled or not disabled is conclusive and terminates the analysis. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible

mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.*  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C.     ISSUES

1.     Whether the ALJ erred in finding that substance abuse was a material factor to a finding of disability, and whether that finding is supported by substantial evidence;

2.     Whether substantial evidence supports the assessment of Omernik's residual functional capacity (RFC);

3.     Whether substantial evidence supports the ALJ's determination that Omernik can perform other work available in significant numbers in the national economy.

D.     ADMINISTRATIVE RECORD

1.     Treatment History

Omernik has bipolar disorder and a history of cocaine use and alcoholism.  In December 1999, she was hospitalized at Timberlawn Mental Health System for treatment after she attempted to jump from a moving car.  (Tr. 110).  Her diagnoses included depression, cocaine abuse, and alcohol abuse.  (Tr. 113).  Omernik reported at least five previous hospitalizations, and admitted binging on alcohol and crack cocaine for the past several days.  (Tr. 112).  She was discharged one week later with prescriptions for Wellbutrin and Paxil.  Her prognosis was listed as fair, but given her history of substance abuse, she was considered at chronic risk due to poor judgment.  (Tr. 111).

Omernik was admitted to Rusk State Hospital on August 6, 2002 after taking an overdose

of cocaine and alcohol. (Tr. 117). She claimed that she was using illegal substances to self-medicate her mental condition because she had no money for her prescription medications. (Tr. 119). She stated that she had not taken her prescribed medications in three years. (Tr. 120). Omernik was hostile and blunt during initial interviews, and reported being sexually and physically abused by her spouse and family members. (Tr. 129-34). Laboratory tests during her hospitalization were positive for hepatitis C antibodies.[1] (Tr. 137). Omernik was given Wellbutrin for depression, BuSpar and Klonopin for anxiety, and thiamin for her history of alcoholism. Omernik was to follow-up with local mental health services on an outpatient basis after her discharge on August 15, 2002. Her discharge diagnoses were bipolar disorder and polysubstance abuse. (Tr. 137).

In January 2003, Omernik underwent a psychological evaluation with John Savell, Ph.D., for purposes of obtaining vocational counseling and services through the Texas Rehabilitation Commission to obtain her license as a massage therapist. (Tr. 139). Omernik reported having severe mood swings, and when depressed, she tended to sleep excessively and lacked energy and motivation. Her manic phases caused sleep disturbances, cleaning sprees, and excessive talking. (Tr. 140). She reported that she was not taking any medications or attending counseling, and had not used drugs for the past three months; however, she continued to drink alcohol on a daily basis. She recognized that her abuse of drugs and alcohol made her bipolar disorder worse. (Tr. 140). She currently resided with friends. (Tr. 140).

Savell noted that Omernik appeared to be somewhat manic during the interview and

---

[1] Hepatitis C is a viral disease and the most common form of post-transfusion hepatitis. It also follows parenteral (injected) drug abuse, and is a common acute sporadic hepatitis. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 808 (29th ed. 2000).

exhibited superficial cheerfulness.  She was neatly dressed and groomed, and was cooperative during the interview.  (Tr .141).  Savell administered a batter of personality and intelligence tests that showed Omernik to be in the average range of intelligence.  Personality testing reflected characteristics of anti-social, impulsive, and overactive behavior, with poor judgment.  Savell diagnosed bipolar disorder and a substance abuse disorder.  He recommended additional mental health treatment, but otherwise approved of Omernik's vocational plans.  (Tr. 146).

Omernik was hospitalized for three days in February 2003 at Green Oaks Behavioral Center after the police found her naked in the street.  She was initially irritable and agitated, and kept asking the officers to shoot her.  (Tr. 149). Her friends reported that Omernik had been using escalating levels of cocaine.   She had reportedly been off her bipolar medications for the past one or two months.  She was manic during the first twenty-four hours of her hospitalization, but responded better to treatment after that.  Upon discharge, Omernik was alert and oriented.  She demonstrated good attention and concentration, as well as good recent and remote memory.  (Tr. 150).  Omernik rejected recommendations that she participate in outpatient chemical dependency treatment, and was discharged with prescriptions for Tegretol, Trilafon, and Albuterol.  (Tr. 151).   She was discharged with a good prognosis if she remained abstinent from drugs and compliant with her current treatment regiment.  (Tr. 151).

Omernik sought outpatient treatment with the Tarrant County Mental Health and Mental Retardation (MHMR) services in February 2003.  She admitted being off her medications since 2000, and she had not had the prescriptions filled that were given to her after her Green Oaks' hospitalization.  (Tr. 193). Her speech was pressured, and she felt nervous and tense.  (Tr. 193). She

reported a depressed mood and decreased energy, with increased irritability and agitation. (Tr. 196).
She was given prescriptions for Trileptal as a mood stabilizer, Wellbutrin for depression, and
BuSpar for anxiety. (Tr. 191). In April, Omernik reported doing better and having more energy.
(Tr. 187). Omernik admitted that she was still abusing drugs, and had tested positive for cocaine
use in March, but complained that compliance with her medications did not substantially change her
symptoms. She also complained of extreme drowsiness when she took her medications. (Tr. 175,
182). After missing several appointments, Omernik was seen on a walk-in basis at MHMR on June
23, 2003. (Tr. 178). She admitted drinking and using cocaine, and she smelled of alcohol during
her MHMR appointment. She was using crutches because she had recently broken her foot, and she
stated that she had not take her prescribed medications in four days and had been using cocaine and
alcohol to "self-medicate." She was instructed to resume taking her prescribed medications.

In August, Omernik reported feeling better with her medications, although she was sleeping
more. She denied using any alcohol or drugs. (Tr. 267). In September, Omernik complained that
her medications induced drowsiness, made her lips feel numb, and caused double-vision. (Tr. 265).
She was living with an older couple and assisting them with housework. She did not want to reduce
her daily dosage of Trileptal despite its side-effects, and the staff approved her plan to take smaller
doses more frequently during the day.

Omernik advised the MHMR staff in October 2003 that she had recently used cocaine. She
was feeling manic and excited about the possibility of participating in clinical trials for a new bipolar
medication; however, she was subsequently discharged from the clinical trial program because she
had hepatitis C. (Tr. 261-63). During a follow-up visit in November 2003, Omernik described her

condition as so-so, but reported that her medications seemed to be working. She had not noticed any recent mood swings, and was currently living with friends. Her dosage of BuSpar was increased to address her anxiety about being with her family during the holidays. (Tr. 260). Omernik also went to the public outpatient health clinic in November 2003 for a check-up related to her hepatitis C. She admitted to the intake staff that she continued to drink alcohol, including drinking at noon on the day of her appointment, despite being warned of the dangers of drinking for a person with hepatitis C. (Tr. 280).

Omernik reported doing well during an MHMR appointment on January 26, 2004, and was advised to taper her use of Trileptal due to its effect on hepatitis C patients. She denied having any manic or depressive symptoms. (Tr. 256). Omernik asked to restart Trileptal in February 2004 to control manic symptoms. (Tr. 250). In March 2004, Omernik reported doing much better on Trileptal, and she was happy because the Texas Rehabilitation Commission was going to pay for her massage therapy training. (Tr. 246).

In April 2004, Omernik tested positive for cocaine. The MHMR nurse considered Omernik to be at high risk for a relapse because she lacked insight into her condition. (Tr. 242). Omernik pronounced herself "cured" of hepatitis C because recent laboratory results had been good. (Tr. 242). In May 2004, Omernik reported feeling tired and having crying spells. A prescription for Wellbutrin was added to her treatment regimen. (Tr. 240). In June 2004, Omernik reported that she had about one month of massage therapy school remaining. She reported no intolerable medication side-effects and denied feeling depressed. She reported decreased irritability and a stable mood. Her Wellbutrin prescription was discontinued because she did not feel she needed that medication

any longer.  (Tr. 236).  In July 2004, Omernik was feeling better and more stable.  She was excited because she was almost finished with her massage therapy training, and she acted impatient during her MHMR session.  (Tr. 234).

Treating physician Geetha Reddy, M.D., completed a medical source statement dated September 9, 2004.  Reddy indicated that Omernik's mental impairment, independent of her alcoholism and drug addiction, left her with poor to no ability to handle most of the basic mental activities required of even unskilled work.  (Tr. 301-03).

    2.    Administrative Hearing

Omernik was born July 19, 1963.  She obtained her GED and completed two years of college.  (Tr. 70).  Her past relevant work experience includes positions as a retail store department manager, a painter's helper, and a housekeeper.  (Tr. 76).  She most recently worked as a courier for a law firm, but lost that job after she was hospitalized in December 1999.  (Tr. 326).

Omernik testified that she became depressed after separating from her husband in November 1999.  (Tr. 327).  She also stopped taking her medications in 1999 because she did not think the medications were helpful and the side-effects were intolerable.  (Tr. 327-28, 331).  Instead, she used alcohol and cocaine to manage her bipolar condition before she suffered a breakdown and was hospitalized in December 1999.  (Tr. 328-31).

In August 2002, Omernik was involuntarily committed to Rusk State Hospital on the basis that she posed a danger to herself.  (Tr. 332).  She admitted that she was not taking her medications and had been using cocaine on a daily basis before this hospitalization.  (Tr. 333).  She was hospitalized again in February 2003.  She testified that she had stopped taking the medication her

doctors at Rusk State Hospital had prescribed because she was frustrated by the medication's ineffectiveness.  Omernik conceded that each of her hospitalizations had been preceded by a period where she had stopped taking her medications and/or resumed the use of cocaine and alcohol.  (Tr. 334-36).  Omernik explained that she went through a cycle approximately every nine months where she stopped taking her medications.  (Tr. 336).   She testified that it took her two or three months to recover from these episodes.  (Tr. 345).

Omernik also testified that she had hepatitis C, which had been diagnosed during her hospitalization in 2002, but she currently had no hepatitis-related symptoms.  (Tr. 336, 338).  Her treating physicians had cautioned her against drinking alcohol  because of her hepatitis, as well as the effect of alcohol on her bipolar medications.  (Tr. 336-37).  Omernik also testified that she had broken her ankle in June 2003.  Although the fracture had healed, she no longer wore high-heeled shoes.  (Tr. 347).

Omernik testified that she had not consumed alcohol in three or four months, and had been compliant with her medication regimen during the past year.  (Tr. 337-38).  She thought that her current medications worked better than other medications she had tried.  (Tr. 338).  Despite her compliance, she had experienced a decline in her condition about a month before the hearing. During this depressed period, she cried, felt angry and wanted to die.  (Tr. 340).  She testified that she did not seek professional assistance for her crisis, but instead stayed home and avoided doing anything for a week.  She testified that friends had monitored her condition and took her car keys to prevent her from going anywhere to buy cocaine.  (Tr. 340-41).

Omernik testified that she had manic periods more often than depressed periods.  Her manic

-10-

periods manifested themselves in physical ways, including constant tapping of her hands or feet and incessant talking. (Tr. 343). She was able to sleep at night, but only because she took her prescribed medications in the evening. (Tr. 343-44). She was unable to take some of the standard medications for bipolar disorder because she had hepatitis C. (Tr. 344). Omernik had recently completed a four-month course to obtain her license as a massage therapist, but testified that she expected to work only on a part-time basis to supplement her disability income. She did not think she was capable of working on a full-time basis. (Tr. 342).

Vocational expert Barbara Dunlap testified during the hearing. Dunlap classified Omernik's previous jobs as a painter's helper or housekeeper as semiskilled work requiring medium exertion; the job of department manager was a skilled position that also required medium exertion; and a job as a courier or office clerk required light exertion and was unskilled to semiskilled work. (Tr. 348-49). The ALJ asked Dunlap to consider the following hypothetical person:

> 41 years of age, the same work experience as the claimant. The ability to [perform] medium work with the following specific restrictions: Not required to climb scaffolds, ladders and ropes. Not required to maintain concentration and attention for periods of longer than 20 minutes without the opportunity to briefly refocus for a minute or two and come back to concentration. Not required to understand, remember and carry out more than simple instructions.

(Tr. 349). Dunlap testified that none of Omernik's previous jobs would accommodate these restrictions, but there were unskilled jobs available. Examples included packager positions or cleaner positions, with more than 60,000 jobs available nationally. (Tr. 350). When presented with the limitations outlined in Reddy's medical source statement, Dunlap testified that no competitive employment would be available. (Tr. 351).

3.      ALJ Decision

The ALJ found that Omernik had not engaged in substantial gainful activity since January 2000, and further found that Omernik's polysubstance abuse and bipolar disorder constituted severe impairments; however, Omernik's condition did not meet or medically equal the criteria of any listed impairment. (Tr. 23). The ALJ acknowledged Reddy's opinion, but found that Reddy's assessment only matched Omernik's symptoms when she was severely depressed or manic and noted that these episodes occurred when Omernik was noncompliant with her treatment and using drugs or alcohol. (Tr. 19).

The ALJ found that Omernik, absent the use of drugs and alcohol and when compliant with treatment, retained the residual functional capacity for medium work that did not require: climbing scaffolds, ladders or ropes; maintaining fixed concentration and attention for periods longer than twenty minutes without an opportunity to briefly refocus for a minute or two before coming back to fixed concentration; or understanding, remembering and carrying out more than simple instructions. (Tr. 23). The ALJ specifically found that Omernik's drug and alcohol abuse was "a contributing factor material to a finding of disability." (Tr. 23).

The ALJ proceeded to Step Five of the sequential evaluation process after finding that Omernik's residual functional capacity was not compatible with her past relevant work. Based on the vocational expert's testimony and the Medical-Vocational Guidelines, the ALJ found Omernik capable of performing a significant number of jobs in the national economy. (Tr. 23). Accordingly, the ALJ concluded that Omernik was not disabled and was not entitled to disability insurance or SSI benefits. (Tr. 23-24).

D.     DISCUSSION

1.     Drug Addiction and Alcoholism

Omernik contends that the ALJ misapplied the law when considering the effect of Omernik's

substance abuse on the disability determination.  More specifically, Omernik contends that the ALJ

erred in finding that her drug addiction or alcoholism was a contributing factor material to a

determination of disability[2] without first finding that she was disabled.  She bases her argument on

a literal reading of the administrative regulations, which provide:  "*If we find that you are disabled*

*and have medical evidence of your drug addiction or alcoholism, we must determine whether your*

*drug addiction or alcoholism is a contributing factor material to the determination of disability.*" 20

C.F.R. §§ 404.1535(a), 416.935(a) (emphasis added).  A review of the ALJ's decision does not

support Omernik's position.

The ALJ did not use the word "disabled," but his decision nonetheless reflects that he was

of the opinion that Omernik was disabled when she stopped following her treatment regimen and

abused drugs or alcohol. Even Omernik concedes that the ALJ implies that her impairments are

disabling when Reddy's opinions are given controlling weight.  (Plf. Br. at 7).  The ALJ

acknowledged treating psychiatrist Reddy's opinion that Omernik generally had poor to no ability

to perform the mental demands of unskilled work, (Tr. 18), but the ALJ also found that Reddy's

assessment only matched Omernik's symptoms when she was either severely depressed or manic.

The ALJ further found that the episodes of severe depression or mania corresponded with Omernik's

---

[2]  The Contract with America Advancement Act of 1996 (CAAA), Pub. L. No. 104-121, 110 Stat. 847, amended the Social Security Act and renders individuals ineligible to receive disability insurance or SSI benefits if alcoholism or drug addiction is a contributing factor material to the Commissioner's determination that the individual is disabled.

periods of noncompliance with treatment and her use of drugs and alcohol.  (Tr. 19).  The ALJ also

found that Omernik's residual functional capacity (RFC) during her periods of hospitalization was

for a less than sedentary level of work, but opined that Omernik was capable of a modified range

of light work when she was compliant with her medications and avoided drugs and alcohol.  (Tr.

20).  The ALJ's decision reflects his determination that Omernik was disabled when the effects of

all of her impairments, including her drug and alcohol addictions, are considered collectively.

     Omernik also contends that the ALJ was required to assess a RFC that included the effects

of her drug addiction and alcoholism before proceeding to address whether her substance abuse was

a material and contributing disability factor.  She complains that the ALJ instead subtracted out

unknown and undisclosed work-related limitations to arrive at his RFC determination.

     The administrative regulations address the procedure for deciding whether drug addiction

or alcoholism is a contributing factor material to the disability determination, and require the ALJ

to evaluate which current physical and mental limitations would remain if the claimant stopped

using drugs or alcohol.  20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2).  If the remaining limitations

would not be disabling, than drug addiction or alcoholism will be found to be a contributing factor

material to the determination of disability.  *Id*.  § 404.1535(b)(2)(i), 416.935(b)(2)(i).  The ALJ

acknowledged that Reddy's assessment would preclude the basic mental requirements of even

unskilled work, and that during periods of hospitalization, Omernik's RFC was reduced to less than

sedentary work activity.  But the ALJ expressly found that Omernik, when she avoided illegal drugs

and alcohol and complied with treatment, was capable of performing medium work  that required

only simple tasks and limited periods of fixed concentration.  (Tr. 20).  Although Omernik would

prefer a more detailed explanation of the ALJ's assessment of her functioning, the ALJ adequately

complied with the relevant administrative regulations in assessing her RFC.

Omernik alternatively contends that the ALJ's materiality determination is unsupported by substantial evidence because there is no evidence reliability reflecting or predicting how she would function if she stopped using drugs or alcohol. She asserts that her addictions are "part and parcel" of her bipolar disorder that makes separation of her conditions impossible, and cites to a transcript of a teleconference the Social Security Administration held in July 1996 to address various concerns the regional offices had in dealing with the drug abuse and alcoholism exceptions for disability determinations. *See* Social Security Administration, EM-96200, Emergency Teletype -- Questions and Answers Concerning DAA from the 07/02/96 Teleconference (Aug. 30, 1996). In this question-and-answer teleconference, the administration found that a claimant's drug addiction or alcoholism must be considered non-material if the limitations and restrictions imposed by the substance abuse cannot be separated from the mental restrictions and limitations imposed by the claimant's other mental impairments. *See id.* (answering questions 28-29). The administration acknowledged that there was no research data upon which to reliability predict improvement, but suggested that the most useful evidence in predicting the expected improvement in a claimant's condition if he stopped abusing drugs or alcohol evidence might be obtained from reviewing the claimant's periods of abstinence. *See id.* The period of abstinence does not have to be for any predetermined length of time, although the length of the period of abstinence is one consideration. *See id.*

The plaintiff has the burden of proving that drug or alcohol addiction is not a contributing factor material to his disability. *Brown v. Apfel,* 192 F.3d 492, 498 (5th Cir.1999). In Omernik's case, the ALJ did not credit Omernik's testimony that she had "episodes" every nine months, regardless of her compliance with treatment or abstinence from drugs and alcohol. He noted that

all of her hospitalizations were during periods when she was not taking her prescription medications and was instead drinking and using cocaine.  (Tr. 20).  Credibility determinations by the ALJ are entitled to deference.  *See Falco v. Shalala*, 27 F.3d 160, 164 & n. 18 (5th Cir. 1994).  The ALJ also considered Omernik's only documented period of abstinence since her alleged onset date, which was the three or four months preceding the administrative hearing when she completed massage therapy school.  The ALJ observed that Omernik had demonstrated her ability to attend school, work, and visit with friends when she followed her treatment regiment and avoided drugs and alcohol. (Tr. 20).

Omernik's contention that the evidence does not reflect how she would function if she abstained from the use of drugs or alcohol is unsupported by the record.  Omernik fails to demonstrate that she met her burden of proof on this issue or that the ALJ's decision that her substance abuse is a contributing factor material to the disability determination is unsupported by substantial evidence.[3]

2.      Vocational Evidence

Omernik also contends that substantial evidence does not support the ALJ's decision that she was capable of performing other work existing in significant numbers in the national economy. Omernik asserts that the ALJ relied on vocational expert testimony that was provided in response to a defective hypothetical that did not reflect any limitations associated with her drug or alcohol abuse.  The hypothetical presented to the vocational expert must reasonably incorporate all of the disabilities recognized by the ALJ's residual functional capacity assessment, and the claimant or his

---

[3]   Omernik also asserts that the ALJ's determination that her condition fails to meet or equal a listing is unsupported by substantial evidence.  (Plf. Br. at 6).  Omernik does not identify which listing(s) she allegedly meets or equals, nor does she compare her own impairments with the criteria of any listed impairment for purposes of establishing her entitlement to a finding of disability at Step Three of the sequential evaluation process. Accordingly, her assertion should be deemed abandoned and will not be addressed in these proposed findings.

representative must be afforded the opportunity to correct any deficiencies in the ALJ's question. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

Omernik cannot establish error or harm, and she resolves her own complaint when she notes in her brief that the vocational expert, when questioned about the limitations included in Reddy's medical source opinion, testified that there were no jobs that would accommodate an individual with those limitations. (Tr. 351). As discussed *supra*, the ALJ implicitly acknowledged in his decision that Reddy's assessment would render Omernik disabled, but the ALJ also confined Reddy's assessment to Omernik's condition when she was non-compliant with treatment, drinking alcohol, and abusing drugs. The ALJ did not adopt Reddy's assessment in evaluating the work-related restrictions related to Omernik's bipolar disorder when Omernik was sober and compliant with treatment. Omernik does not contend that the hypothetical presented to the vocational expert is not an accurate reflection of her RFC, as found by the ALJ, when she takes her prescription medications and avoids abusing illegal drugs or alcohol. Accordingly, the ALJ did not err in relying on the vocational expert's testimony, and the ALJ's decision at Step Five of the sequential evaluation process is based on substantial evidence.

<u>RECOMMENDATION</u>

It is recommended that the Commissioner's decision be affirmed.

### NOTICE OF RIGHT TO OBJECT TO PROPOSED
### FINDINGS, CONCLUSIONS AND RECOMMENDATION
### AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until April 20, 2006. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

### ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until April 20, 2006 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to

the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby

is returned to the docket of the United States District Judge.

SIGNED MARCH 30, 2006.


   /s/   Charles Bleil
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE